IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **TIGEST DAWN DUNCAN,** | § | |
| **Plaintiff,** | § | |
| | § | |
| | § | **Civil Action No. 3:19-CV-1333-S-BH** |
| | § | |
| **ANDREW SAUL,** | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Referred to U.S. Magistrate Judge[1]** |

<u>**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**</u>

Tigest Dawn Duncan (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner)[2] denying her claims for disability insurance benefits (DIB) and for supplemental security income (SSI) under Title II and Title XVI of the Social Security Act. (*See* docs. 1, 14.)  Based on the relevant filings, evidence, and applicable law, the Commissioner's decision should be **AFFIRMED**.

## I.  BACKGROUND

On August 8, 2016, Plaintiff filed her applications for DIB and SSI, alleging disability beginning on June 1, 2016. (doc. 11-1 at 259, 261.)[3]  Her claims were denied initially on October 6, 2016 (*Id.* at 120-21), and upon reconsideration on December 6, 2016 (*id.* at 149-50).  On January 18, 2017, Plaintiff requested a hearing before an Administrative Law Judge (ALJ). (*Id.* at 167.)  She appeared and testified at a hearing on December 18, 2017.  (*Id.* at 38-92.)  At the hearing, she

---

[1]By *Special Order No. 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2]At the time this appeal was filed, Nancy A. Berryhill was the Acting Commissioner of the Social Security Administration, but Andrew Saul became the Commissioner of the Social Security Administration on June 17, 2019, so he is automatically substituted as a party under Fed. R. Civ. P. 25(d).

[3]Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

amended her alleged onset date to a day between November 2 and November 30, 2015. (*Id.* at 42.)
On May 31, 2018, the ALJ issued a decision finding her not disabled. (*Id.* at 12.)

Plaintiff timely appealed the ALJ's decision to the Appeals Council on June 12, 2018. (*Id.* at 257-58.) The Appeals Council denied her request for review on April 22, 2019, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-8.)   She timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (*See* doc. 1.)

A.    <u>Age, Education, and Work Experience</u>

Plaintiff was born on September 25, 1974, and was 43 years old at the time of the hearing. (doc. 11-1 at 44.)  She had completed high school and could communicate in English. (*Id.* at 46.) She had past relevant work as a telephone solicitor, a child monitor, and a psychiatric technician. (*Id.* at 80-81.)

B.    <u>Medical, Psychological, and Psychiatric Evidence</u>[4]

On January 12, 2015, Plaintiff presented to ophthalmologist and retinal specialist, G. Philip Matthews, M.D., for an eye examination. (doc. 11-1 at 545.)  She had right-eye panretinal photocoagulation (PRP) laser treatment on November 26, 2014. (*Id.*)  She reported blurry/cloudy vision and black spots, but her flashes had decreased. (*Id.*)  Dr. Matthews assessed type 2 diabetes mellitus with ophthalmic manifestations, right-eye PRP, and right-eye proliferative diabetic retinopathy (PDR). (*Id.* at 546.)

On July 31, 2015, Plaintiff presented to the emergency department at Charlton Methodist Hospital (Charlton) with right-sided numbness and weakness. (*Id.* at 576-94.)  She reported that the symptoms had lasted for three days, and that the pain was throbbing, constant, and radiated from the

---

[4]Because only Plaintiff's physical impairments are at issue, psychological and psychiatric medical evidence is noted only when it includes information relevant to the physical impairments.

neck to the right arm. (*Id.* at 576.)    Physical examination was normal and no significant abnormalities were noted. (*Id.* at 578-79.) A chest X-ray was negative for acute cardiopulmonary disease. (*Id.* at 591.) A cervical spine CT scan was positive for disc bulges at C3-C6, but there was no evidence of traumatic disruption of the cervical spine and neck. (*Id.* at 593-94.) The emergency department physician was unable to determine exact etiology of pain, but believed it was related to cervical radiculopathy. (*Id.* at 584.)

Plaintiff returned to Charlton with complaints of worsening neck and upper back pain on August 8, 2015. (*Id.* at 594-610.)    She reported abdominal pain and neck pain, but denied joint/muscle pain, headache, weakness, or numbness. (*Id.* at 598-99.)    Examination of her extremities showed normal range of motion, and there was no tenderness, cyanosis, or edema. (*Id.* at 599.) An abdomen/pelvis CT scan showed no acute abnormality, and a chest X-ray was negative for acute pulmonary process. (*Id.* at 602-03.)    A cervical spine CT scan showed age-related degenerative changes, but was negative for acute fracture or subluxation in the cervical spine. (*Id.* at 603-04.)  Plaintiff was treated for a urinary tract infection and discharged with instructions to follow-up with her primary care provider. (*Id.* at 604.)

On October 1, 2015, Plaintiff returned to Charlton complaining of left ankle pain and swelling after slipping on wet floor. (*Id.* at 617.)  She was ambulating with a limp, but denied right-lower extremities paresthesia or pain in the hips, left knee, or right-lower extremities. (*Id.*) Physical examination of the lower extremities noted diffuse tenderness to palpation of the left ankle and edema of the left foot and ankle, as well as normal strength, tolerated gait, and intact range of motion. (*Id.* at 620.) A left-ankle X-ray showed ankle edema, but was negative for acute fracture or dislocation. (*Id.* at 621.)  Plaintiff was assessed with a left ankle sprain and instructed to take pain

relievers as needed.  (*Id.* at 622.)

On October 15, 2015, Plaintiff presented to Parkland Health Clinic (Parkland) for diabetes follow-up. (*Id.* at 433.)  She reported that her diabetes symptoms had "been up and down," but she had increased bilateral leg swelling in the past month. (*Id.*)  Musculoskeletal edema and +2 pitting edema of the lower extremities were observed during physical examination. (*Id.* at 435.)  She was assessed with diabetes mellitus, seasonal allergies, blurry vision, rash, essential hypertension, and pedal edema or swollen feet. (*Id.* at 436.)  Plaintiff returned to Parkland complaining of right-eye pain and pressure and bilateral blurry vision on October 30, 2015, and was referred to ophthalmology. (*Id.* at 428-31.)

On December 10, 2015, Plaintiff returned to Parkland with abnormal vaginal bleeding and labial bump. (*Id.* at 420-21.) Pelvic examination was normal and no redness or edema was observed. (*Id.* at 424.)  She was assessed with symptomatic anemia, was advised to take iron, and was continued on hormones and birth control. (*Id.* at 426.)

On December 15, 2015, Plaintiff presented to the Ophthalmology Department at Parkland for eye examination. (*Id.* at 418-20.)  She reported a bursted blood vessel because of trauma to her right eye a year ago, and recent intermittent blurry vision. (*Id.* at 418.)  She was diagnosed with PDR, and PRP laser treatment was performed on her left eye. (*Id.* at 419-20.)

On January 8, 2016, Plaintiff presented to her primary care physician, Oladele Olusanya, M.D., for diabetes treatment. (*Id.* at 388.)  She reported a rash and swollen legs for 6 months "off and on," and she was not monitoring her glucose at home because she did not have a blood sugar testing machine or strips. (*Id.*)  She had a BMI of 52.01 and an A1c of 8.8, and reported prior weight-loss success with Adipex. (*Id.* at 389-90.) Dr. Olusanya noted that she had normal skin, and

examination of the extremities was unremarkable, with no clubbing or edema. (*Id.* at 389.) He assessed type 2 diabetes mellitus with diabetic nephropathy, retention of urine, essential hypertension, rash and other nonspecific skin eruption, localized edema, morbid obesity, gastro-esophageal reflux disease, allergic rhinitis, other muscle spasm, constipation, headache, and insomnia, and educated her about diabetes, including diet, exercise, risk reduction and home management, medical complications, and blood sugar testing and monitoring. (*Id.* at 389-91.) He prescribed Adipex-P for obesity, and refilled her medications, including Metformin and NovoLog for diabetes, hydrochlorothiazide-lisinopril for hypertension, Colace for constipation, Fioricet for headaches, Zolpidem for insomnia, and cyclobenzaprine, Lyrica, and tramadol for muscle spasms. (*Id.*) At a follow-up with Dr. Olusanya on February 5, 2016, she reported doing well on her current diabetic treatment. (*Id.* at 393-95.) She had a BMI of 50.05, and had lost 12 pounds since her last appointment. (*Id.* at 393-94.) She reported joint and back pain, but denied headaches, rashes, joint swelling, myalgias, leg edema, or tingling/numbness. (*Id.* at 393.) On examination, her back was normal and extremities were unremarkable without clubbing or edema. (*Id.*)

On April 26, 2016, Plaintiff presented to Charlton with abdominal pain. (*Id.* at 627.) Physical examination showed no acute unilateral edema or obvious deformities. (*Id.* at 630.) An abdomen and pelvis CT scan showed mild fatty infiltration of the liver, minimal shallow umbilical hernia containing fat, and mild abdominal wall edema, but no acute findings were observed to explain her pain. (*Id.* at 632.)

On May 19, 2016, Plaintiff presented to Dr. Olusanya, complaining of uncontrolled diabetes, anxiety, and obesity. (*Id.* at 396.) She reported tingling in the feet, weight gain, and worsening concentration. (*Id.*) Review of systems was negative for headaches, skin rash, leg edema, joint pain,

5

myalgias, back pain, and tingling/numbness. (*Id.*)

Plaintiff returned to Dr. Olusanya on May 31, 2016, with increased depression, onset of diabetic retinopathy, and tractional retina detachment of the right eye. (*Id.* at 398-400.) She was upset and crying because of severe constipation, diabetes, and vision loss. (*Id.* at 400.)

Between May 2016 and February 2017, Plaintiff presented to Dr. Matthews for multiple treatments and laser surgeries for her eye conditions, including PDR and tractional retinal detachment. (*Id.* at 515-27, 565-74.) At her discharge from Dr. Matthews's care on February 16, 2017, visual testing showed 20/25 right eye vision, 20/40 left eye vision, and that her field of vision was full to finger counting and within normal limits. (*Id.* at 565-66.) Dr. Matthews reported that Plaintiff had bilateral cataracts, but that there was no new evidence of neovascularization or macular edema, and that she was stable after laser treatment for PDR. (*Id.* at 567.)

On September 1, 2016, Roberta Herman, M.D., a state agency medical consultant (SAMC), completed a physical residual functional capacity (RFC) assessment based on the medical evidence. (*Id.* at 93-104.) She opined that Plaintiff had the physical RFC to lift and carry 20 pounds occasionally and 10 pounds frequently; stand and walk (with normal breaks) for about 6 hours in an 8-hour workday; sit (with normal breaks) for about 6 hours in an 8-hour workday; push and pull an unlimited amount of weight, other than shown for lift and carry, with no postural, manipulative, visual, communicative, or environmental limitations. (*Id.* at 99-100.) Dr. Herman noted that Plaintiff's alleged limitations were partially supported by the evidence of record. (*Id.* at 98-99.) SAMC Kim Rowlands, M.D., reviewed and affirmed Dr. Herman's assessment on November 29, 2016. (*Id.* at 140-42.)

On May 17, 2017, Plaintiff suffered a seizure and was transported by ambulance to Charlton.

(*Id.* at 673-721.)  She reported waking up from sleep because of left leg spasms and pain, followed by a seizure. (*Id.* at 676.)  She had pain and weakness in her lower left extremity and was unable to stand on it. (*Id.*)  Review of systems was positive for focal seizures to the left leg and chest tightness, and was negative for back pain, neck pain, rash, dizziness, and headaches. (*Id.* at 677.)  A head MRI confirmed right parietal lobe meningioma. (*Id.* at 717.)  She was treated with Keppra and then Dilantin to control her seizures, and was started on steroids for cerebral swelling and for left lower extremity weakness. (*Id.*)  The emergency department physician recommended evaluation for neurosurgery, and she was discharged to rehabilitation on May 20, 2017. (*Id.* at 674.)  On May 22, 2017, a CT scan of the lumbar spine was negative for acute findings of the lumbar spine. (*Id.* at 721.)

On May 29, 2017, Plaintiff presented to Parkland complaining of continuous headaches and left lower extremity pain. (*Id.* at 842.)  She reported that her headache was right-sided, intermittent, and worsened when lying down. (*Id.*)  She had pain from the left knee down to the ankle that felt heavy and numb, but there was no shooting pain or weakness, and she could ambulate with some left leg drag. (*Id.*)  A brain CT scan showed stable meningioma with no midline shift. (*Id.* at 853.)  The examining physician noted that the meningiomas were slow growing and unlikely to account for Plaintiff's headaches and left lower extremity pain, but they could account for her seizures. (*Id.*)  She was referred to neurology for seizure work-up and management. (*Id.* at 852.)  A brain MRI dated September 5, 2017, showed no significant change in size or morphology of the right parietal meningioma. (*Id.* at 863-64.)

Plaintiff presented to ophthalmologist, Elliot Brobbaker, M.D., for cataract removal surgery on May 12 and August 7, 2017. (*Id.* at 792-93, 811-12.)  On August 15, 2017, Plaintiff reported that her vision was improving at distance, but was still little blurry at near. (*Id.* at 815-17.)  Plaintiff

7

reported that she was "doing well" after both procedures on September 20, 2017. (*Id.* at 821.)

On October 5, 2017, Plaintiff presented to retinologist, Abdul Khan, M.D., with diabetic blurriness and double vision of both eyes. (*Id.* at 920.)  Dr. Khan assessed type 2 diabetes with proliferative retinal neuropathy and macular edema. (*Id.*)  He administered Intra-Vitreal Abastin injections in each eye on October 11, 2017. (*Id.* at 928-38.)

On November 7, 2017, Dr. Brobbaker completed a vision medical source statement for Plaintiff. (*Id.* at 940-43.)  He reported that Plaintiff had cataracts with a good prognosis, and proliferative diabetic retinopathy with a guarded prognosis.  (*Id.* at 940.) She had good central vision and foreign body sensation in both eyes. (*Id.*)  Dr. Brobbaker opined that she could perform work activities involving near acuity, far acuity, depth perception, accommodation, and color vision frequently, and field of vision rarely. (*Id.* at 941.)  He also opined that she did not have any exertional or postural limitations related to her vision problems. (*Id.*)

On November 28, 2017, Dr. Olusanya provided a medical source statement for Plaintiff. (*Id.* at 973-78.)  He reported that she suffered from focal seizures, type 2 diabetes, bipolar disorder, and brain tumor, and that her symptoms included pain, dizziness, blurred vision, fatigue, headaches, anger outbursts, and being withdrawn. (*Id.* at 973.)  He opined that the neurological conditions of seizures prevented her from working or driving, and that her impairments had lasted or were expected to last at least twelve months. (*Id.*)  He opined that Plaintiff would need unscheduled breaks, that she could sit and/or stand for 5 minutes at a time and for no more than 2 hours total in an eight-hour work day, and that she could not twist or lift and/or carry even less than 10 pounds. (*Id.* at 974-75.)  He determined that Plaintiff was incapable of even "low stress" work, and that her impairments would likely produce "good days" and "bad days" and likely result in absences from

work of more than four days per month. (*Id.* at 976.)  Dr. Olusanya also opined that Plaintiff's pain would distract her from adequate performance of daily activities or work, that physical activity would greatly increase her pain to such a degree as to cause total abandonment of task, and that drug side effects were expected to severely limit her ability to work. (*Id.* at 977-78.)

On November 29, 2017, Dr. Khan completed a vision impairment medical source statement for Plaintiff. (*Id.* at 979-83.)  He reported that she had type 2 diabetes mellitus with proliferative diabetic retinopathy and macular edema, and that her prognosis was good. (*Id.* at 979.)  Dr. Khan opined that Plaintiff did not have any limitations in activity from her vision. (*Id.* at 980.)

## C.    Hearing

On December 18, 2017, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ. (doc. 11-1 at 38-92.)  Plaintiff was represented by an attorney. (*Id.* at 40.)[5]

### 1.    Plaintiff's Testimony

Plaintiff testified that she could only drive sometimes because of her seizures and impaired vision, and that her sister drove her to the hearing. (*Id.* at 45.) She graduated high school and could read, write, and do basic math. (*Id.*)  She quit working in November 2015, because the vessels in her eyes busted and she was unable to see. (*Id.*) She also worked full-time in telemarketing for two months in 2015 and was seated most of the time. (*Id.* at 47-48.) She previously worked part-time as a home health aide and worked in daycare for eight to nine months. (*Id.* at 48-49.)  She worked as a residential specialist at a group home for three years off and on, where she did grocery shopping, assisted residents to the restroom, and was on her feet most of the time. (*Id.* at 49-50.)  She was unable to do full-time work because of her impairments, including bipolar and manic disorder, mood

---

[5]At the start of the hearing, Plaintiff's attorney moved to amended the alleged onset date from June 1, 2016, to a day between November 2nd and 30th of 2015. (doc. 11-1 at 41-42.)

disorder, diabetes, high blood pressure, vision problems, tumor, and seizures. (*Id.* at 51-52.)  Her

vision was very bad, even with glasses on, and she was unable to type because of neuropathy pain.

(*Id.*)  She also had neuropathy pain and swelling in her feet. (*Id.*)

In May 2017, Plaintiff was transported to the hospital by ambulance after having a seizure

in her sleep, and was diagnosed with a brain tumor. (*Id.* at 53.)  She took Dilantin and Keppra for

seizure control, but she continued having focal seizures at least twice a month. (*Id.* at 55.)  She was

fully awake for each episode, and the left side of her body would twitch for three to six  minutes.

(*Id.* at 56.)  After a seizure, she would be very tired and needed to lie down for two to three hours.

(*Id.*)  She had excruciating headaches daily and would need to take Fioricet and Tylenol-3 and would

lay down in a dark room for two to three hours. (*Id.*)  She would see her primary care doctor, Dr.

Olusanya, once a month for treatment for her headaches and diabetes. (*Id.* at 58-59.)

Plaintiff had been a diabetic since age 18 and took injectable insulin and metformin for her

diabetes. (*Id.* at 58-59.)  She checked her blood sugar levels twice daily, which would run between

60 and 260, and her A1c was currently 9.0. (*Id.*at 59.)  When her blood sugar was too high, she

experienced weakness, dizziness, blurred vision, and tingling sensation in her hands and feed. (*Id.*

at 60.)  She had gastroparesis and was constipated all of the time. (*Id.* at 61.)  She had numbness,

tingling, and pain in her feet two to three times a week, and the pain sometimes prevented her from

standing or walking. (*Id.* at 62.)  Her feet would swell at least twice a week due to her high blood

pressure, and she had to prop them up on a pillow for 30 minutes to an hour four to five times a day

to reduce swelling per her doctor's instructions. (*Id.* at 63-64.)  She had numbness and tingling in

her hands and fingers, as well as difficulty gripping and holding, which affected her ability to drive,

type, write, get dressed, and cook. (*Id.* at 64-65.)  She visited Dr. Khan, a retinal specialist, once a

10

month for vision problems. (*Id.* at 65-66.)  She had numerous surgeries and laser treatment procedures for glaucoma, detached retina, and other eye problems, and had "horrible" central and peripheral vision, and was unable to drive, watch TV, or read because everything was blurry. (*Id.* at 65-68.)

Plaintiff had two teenage children, and they and her sister would help with housework and shopping. (*Id.* at 72-73.)  She was able to cook some stuff at home but did not do laundry or activities requiring bending because of back problems. (*Id.* at 74-75.)  She had glasses and was sometimes able to watch TV or to look at her cell phone. (*Id.* at 76-77.)  She had been treated for neuropathy of her hands and feet for over eight years, and Lyrica sometimes helped with her symptoms. (*Id.* at 77-78.)  Her vision fluctuated, and she would be able to drive two days out of the week. (*Id.* at 79.)

### 2.    VE's Testimony

The VE testified that Plaintiff had previous work experience as a telephone solicitor, which was sedentary work with a SVP of 4; a child monitor, which was medium work with a SVP of 3; and a psychiatric technician, which was medium work with a SVP of 4. (*Id.* at 80-81.)  A hypothetical person with the same age, education, and work experience history as Plaintiff, who could sit six of eight hours and stand or walk six of eight hours, lift or carry 20 pounds occasionally and 10 pounds frequently, had sufficient visual acuity to work with large and small objects, was able to avoid ordinary hazards in the workplace, could perform simple tasks, attend and concentrate for extended periods with usually morning and afternoon breaks, make simple work-related decisions, respond appropriately to frequent changes in the work place, and have frequent contact with supervisors, co-workers, and the public, would not be capable of performing her past relevant work because of the

non-exertional limitations for simple work and frequent contact with the public. (*Id.* at 81-82.)
There was other available work that the hypothetical person could perform, including cleaner or
housekeeper (light and SVP-2) with 1 million jobs nationally; inspector and hand packager, plastic
products (light and SVP-2) with 25,000 jobs nationally; and bakery worker, conveyor line (light and
SVP-2) with 35,000 jobs nationally. (*Id.* at 116-18.)   The same hypothetical person could also
perform those jobs if she was further limited to the following: sufficient visual acuity to work with
large objects but could only work at jobs requiring frequent near and far acuity, frequent depth
perception, and frequent accommodation with only rare field of vision; could climb ramps or stairs
frequently, but never climb ladders, ropes, or scaffolds; never drive; and must avoid exposure to
workplace hazards like unprotected heights and machinery with moving parts. (*Id.* at 82-84.)  If the
second hypothetical person could work with large objects but was unable to work with small objects,
and could only occasionally work jobs with near and far acuity, occasional depth perception,
occasional accommodation, and rare field of vision, she would be precluded from work as an
inspector and hand packager, but would be able to work as a bakery worker, conveyor line and as
a cleaner or housekeeper, as well as a garment packager (light, SVP-2, 676,000 jobs nationally). (*Id.*
at 84-85.)  The same hypothetical person would not be able to maintain and sustain any job in the
national economy if she was able to sit, stand, or walk for a total of no more than two out of eight
hours. (*Id.* at 117-18.)

    Even though the DOT classified cleaner or housekeeper with no visual requirements, the VE
opined that an individual limited to less than occasional on any of the visual requirements from the
previous hypotheticals would not be able to satisfactorily do work as a cleaner or housekeeper. (*Id.*
at 85-86.)  Her testimony was consistent with the DOT and the Occupational Outlook Handbook,

except her opinion on the visual requirements of a cleaner or housekeeper was based on her experience "doing job analysis and labor market surveys and working with individuals who have visual disabilities and placing them." (*Id.* at 86-88.) Chronic absenteeism of two days a month and the ability to have occasional contact with co-workers and supervisors and no contact with the public, are within the minimal requirements for competitive work. (*Id.* at 87-89.) An individual could not maintain employment in the jobs identified by the VE if she needed to elevate her legs to hip-level two to three times a week for between 45 minutes and an hour up to four times a day, or if she would respond inappropriately to criticism from supervisors and would have anger outbursts on an occasional basis. (*Id.* at 89-90.)

D.    **ALJ's Findings**

The ALJ issued a decision denying benefits on May 31, 2018. (*Id.* at 15-32.) At step one, she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of June 1, 2016. (*Id.* at 17.) At step two, the ALJ found that she had the following severe impairments: diabetes mellitus, depression, bipolar disorder, obesity, hypertension, cervical radiculopathy, and proliferative diabetic retinopathy. (*Id.*) Despite those impairments, at step three, the ALJ found that Plaintiff had no impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in the Social Security regulations. (*Id.* at 18.)

Next, the ALJ determined that Plaintiff retained the RFC to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following limitations: stand/walk and/or sit six hours in an eight-hour workday; lift or carry twenty pounds occasionally and ten pounds frequently; climb ramps or stairs occasionally, but never ladders, ropes, or scaffold; never drive; sufficient visual acuity to work with large objects, but could only work at jobs that require frequent

near and far acuity, frequent depth perception, and frequent accommodation and only rare field of vision; avoid exposure to workplace hazards like unprotected heights and machinery with moving parts; perform simple tasks; attend and concentrate for extended periods with usual morning and afternoon breaks; make simple work-related decisions; respond appropriately to frequent changes in the workplace; and frequent contact with supervisors, co-workers, and the public. (*Id.* at 20.) At step four, the ALJ determined that Plaintiff was unable to perform her past work as a telephone solicitor, a child monitor, or a psychiatric tech. (*Id.* at 30.) At step five, the ALJ found that although Plaintiff was not capable of performing past relevant work, considering her age, education, work experience, and RFC, there were other jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 31.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, at any time from June 1, 2016, through the date of the ALJ's decision. (*Id.* at 32.)

## II. STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See Id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See Id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of

vocational factors.

4.      If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.      If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.  ISSUES FOR REVIEW

Plaintiff presents four primary issues for review:

1.      The ALJ found that the Plaintiff has severe impairments. But the ALJ failed to consider that the Plaintiff has been found to have a brain tumor and cerebral edema, and a seizure disorder. She has also been treated for migraine headaches[.] The ALJ's residual functional capacity determination does include restrictions against hazards but does not consider the additional functional limitations resulting from Plaintiff's seizure disorder, tumor, migraines, or cerebral edema. Did the ALJ properly consider all of the Plaintiff's functional limitations in establishing her residual functional

16

capacity (RFC)?

The Plaintiff maintains that the answer is "No."

2.    The ALJ noted the opinion of the Plaintiff's treating physician but gave this opinion "no weight." In doing so, the ALJ failed to consider the factors set forth by the Commissioner to evaluate medical opinion evidence. Did the ALJ properly consider medical opinion evidence in establishing Plaintiff's RFC?

The Plaintiff contends that the answer is "No."

3.    Having found that the Plaintiff cannot perform her past work, the burden shifted to the Commissioner to establish the existence of other work, in significant numbers, which she can perform. But the ALJ failed to identify work within the Plaintiff's exertional ability or skill level, as set forth in the ALJ's RFC determination. Did the Commissioner carry his burden of establishing the existence of work in significant numbers which the Plaintiff can perform?

The Plaintiff argues that the answer is "No."

4.    The Plaintiff amended her application to assert an onset of disability in November 2015. The ALJ found that the Plaintiff was not disabled from June 1, 2016 through the date of the decision. Accordingly, there is an unadjudicated period. Did the ALJ properly consider the entire period at issue in determining disability?

The Plaintiff submits that the answer is "No."

(doc. 14 at 2-3.)

## A.    <u>Severe Impairment</u>

Plaintiff argues that the ALJ failed to consider all of her vocationally significant impairments in assessing her RFC. (doc. 14 at 7.)  She claims that the ALJ's RFC is deficient because the ALJ did not include her meningioma, cerebral edema, leg edema, or headaches as severe impairments, and because she failed to properly consider the effects her headaches and seizures had on her ability to perform work-related activities. (*Id.* at 7-8.)  The Commissioner responds that the ALJ properly

considered these impairments in determining Plaintiff's RFC, and that even if the limitations related to these impairments were not properly considered, such error was harmless because the ALJ proceeded beyond step two. (doc. 15 at 3-5.)

At step two of the sequential evaluation process, the ALJ "must consider the medical severity of [the claimant's] impairments." 20 C.F.R. § 404.1520(a)(4)(ii), (c). To comply with this regulation, the ALJ "must determine whether any identified impairments are 'severe' or 'not severe.'" *Herrera v. Comm'r of Soc. Sec.*, 406 F. App'x 899, 903 (5th Cir. 2010). Under the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). The Fifth Circuit has held that a literal application of this regulation would be inconsistent with the Social Security Act because the regulation includes fewer conditions than indicated by the statute. *Stone v. Heckler*, 752 F.2d 1099, 1104-05 (5th Cir. 1985). Accordingly, in the Fifth Circuit, an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Id.* at 1101. In other words, "the claimant [need only] make a *de minimis* showing that her impairment is severe enough to interfere with her ability to do work." *Anthony v. Sullivan*, 954 F.2d 289, 294 n.5 (5th Cir. 1992) (citation omitted). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). The claimant has the burden to establish that her impairments are severe. *See Bowen v. Yukert*, 482 U.S. 137, 146 n.5 (1987).

18

Here, the ALJ found that Plaintiff's diabetes mellitus, depression, bipolar disorder, obesity, hypertension, cervical radiculopathy, and proliferative diabetic retinopathy were severe impairments. (doc. 11-1 at 17.) She determined that her migraine headache was a slight abnormality and had such a minimal effect on her "that it would not be expected to interfere with her to work irrespective of age, education, or work experience." (*Id.* at 18.)[6]  The ALJ did not address or mention Plaintiff's seizures or edema at step two. (See *id.* at 17-18.)

### 1.    Edema

Plaintiff points to the medical records from Parkland and Dr. Olusanya as evidence of her lower extremity edema. (*See* doc. 14 at 7-8.)  Her medical records from Parkland showed 2+ pitting edema of the bilateral lower extremities and musculoskeletal edema upon examination in October 2015. (doc. 11-1 at 433-36.)  Dr. Olusanya's medical records showed that in January 2016, Plaintiff had reported a six-month history of a persistent rash and leg swelling, and he assessed her with localized edema. (*Id.* at 388.)  During her many examinations at Parkland and appointments with Dr. Olusanya and her other medical providers, edema was rarely noted in the medical records, and Plaintiff did not report any limitations or restrictions caused from her edema. (*Id.* at 388-400, 418-36, 576-622, 678-721, 842-52.)  Although Plaintiff testified that her feet would swell up two to three times a week, and her doctor instructed her to elevate her feet for 30 minutes to an hour four to five times a day, those reports of foot swelling or instructions were not in the medical records. (*Id.* at 63-64.)  The ALJ noted that Plaintiff's extremities were unremarkable without clubbing or edema during physical examinations on January 8, February 5, May 19 and 31, and June 7, 2016. (*Id.* at 22-26.)

---

[6]Plaintiff does not argue that the ALJ applied an incorrect standard for evaluating a severe impairment under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). (doc. 14 at 7-8.)

Plaintiff has not shown that her edema was a medical impairment severe enough to interfere with her ability to do work. *See Anthony*, 954 F.2d at 294 n.5. The medical evidence instead shows substantial evidence to support the ALJ's finding that her edema was not a medically determinable impairment that would interfere with her ability to perform work-related activities. *See Andrews v. Astrue*, 917 F. Supp. 2d 624, 639 (N.D. Tex. 2013) (finding no error when the ALJ determined an impairment to be non-severe, even though the SAMC found moderate limitations due to the impairment, because there was a lack of examining medical evidence showing any effect on the plaintiff's ability to work); *see also McDaniel v. Colvin*, No. 4:13-CV-989-O, 2015 WL 1169919 at *5 (N.D. Tex. Mar. 13, 2015) (finding that the ALJ did not err in finding impairments to be non-severe because the ALJ considered the relevant evidence in his decision and the plaintiff did not point to evidence showing "any work-related limitations beyond those already found by the ALJ"). Accordingly, the ALJ did not err.

### 2.    Meningioma, Seizures, and Headaches

Plaintiff refers to the medical records from her hospitalization for seizures in May 2017, and the imaging studies of her head, and Dr. Olusanya's treatment records as evidence that her seizures, meningioma, and headaches were severe impairments. (doc. 14 at 7-8.) The hospital records show that she continued experiencing seizures after receiving Keppra, but that Dilantin was eventually able to control the seizures. (doc. 11-1 at 677.) A head MRI confirmed a right parietal lobe meningioma and mild cerebral edema, but a later MRI showed that the meningioma was stabilized. (*Id.* at 717, 853, 863-64.) Dr. Olusanya's medical records showed that Plaintiff reported migraines and that she requested and was prescribed Fioricet for headaches. (*Id.* at 388-400.)

In her decision, the ALJ noted that Plaintiff had reported weekly migraine headaches and had

been treated for headaches by Dr. Olusanya, but that the record showed no emergency room or medical office visit notes discussing or expressing a concern or migraine headache event. (*Id.* at 18.) She also noted that Plaintiff's seizures were eventually controlled by medication, and that even her treating neurologists did not recommend any restrictions or limitations for her meningioma or seizure disorder. (*Id.* at 25.) Nevertheless, the ALJ determined that Plaintiff's meningioma diagnosis and seizures supported additional restrictions regarding hazards and limitations on driving. (*Id.* at 25, 30.)

Plaintiff has not shown that her seizures, meningioma, and headaches were severe impairments. While her treatment for these impairments are supported by the medical record, "[t]he mere presence of some impairment is not disabling *per se*." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (explaining that plaintiff must demonstrate that "she was so functionally impaired by her [impairment] that she was precluded from engaging in any substantial gainful activity"); *see also Dise v. Colvin*, 630 F. App'x 322, 326 (5th Cir. 2015) (holding that a "diagnosis is not, itself, a functional limitation"). Substantial medical evidence instead supports the ALJ's findings that Plaintiff's seizures, meningioma, and headaches did not interfere with her ability to perform work-related activities. *See Hammond v. Barnhart*, 124 F. App'x 847, 853 (5th Cir. 2005) (holding that, even though there was "some evidence that point[ed] to a conclusion that differ[ed] from that adopted by the ALJ," there was no error because there was "far more than a scintilla of evidence in the record that could justify [the] finding that [the plaintiff's] impairments were not severe disabilities"); *see also McDaniel*, 2015 WL 1169919, at *5.

Moreover, the Fifth Circuit has stated that a failure to make a severity finding at step two is not reversible error when an ALJ continues with the sequential evaluation process. *Herrera*, 406 F.

21

App'x at 903 (citing *Adams v. Bowen*, 833 F.2d 509, 512 (5th Cir. 1987)) (noting the ALJ's failure

to make a severity finding at step two was not a basis for remand where the ALJ proceeded to later

steps of the analysis); *Mays v. Bowen*, 837 F.2d 1362, 1365 (5th Cir. 1988) (per curiam) ("[I]f the

ALJ proceeds past the impairment step in the sequential evaluation process the court must infer that

a severe impairment was found."). Even if the ALJ erred in failing to consider whether meningioma,

cerebral edema, leg edema, headaches, and seizures were severe impairments, the error was harmless

because she proceeded beyond step two. *See Norris v. Berryhill*, No. 3:15-CV-3634-BH, 2017 WL

1078524, at *13 (N.D. Tex. Mar. 22, 2017) (finding that even if the ALJ erred in failing to explain

why he found only certain impairments to be severe, the error was harmless where he proceeded

with the sequential evaluation process).

### B.    <u>Treating Source Opinion</u>[7]

Plaintiff contends that the ALJ failed to properly evaluate the opinions of her treating

physicians in a manner consistent with the regulations. (doc. 14 at 8-10.)

The Commissioner is entrusted to make determinations regarding disability, including

weighing inconsistent evidence. *See* 20 C.F.R. § 404.1529(b). Every medical opinion is evaluated

regardless of its source, but the Commissioner generally gives greater weight to opinions from a

treating source. *Id.* § 404.1527(c)(2). A treating source is a claimant's "physician, psychologist,

or other acceptable medical source" who provides or has provided a claimant with medical treatment

or evaluation, and who has or has had an ongoing treatment relationship with the claimant. *Id.* §

---

[7]On January 18, 2017, the Administration updated the rules on the evaluation of medical evidence. *See* 82 Fed. Reg. 5844, 5853 (Jan. 18, 2017). For claims filed on or after March 27, 2017, the rule that treating sources be given controlling weight was eliminated. *See Winston v. Berryhill*, 755 F. App'x 395, 402 n.4 (5th Cir. 2018) (citing 20 C.F.R. § 404.1520c(a) ("We will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)"). Because Plaintiff filed her application before the effective date, the pre-2017 regulations apply.

404.1502. When "a treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," the Commissioner must give such an opinion controlling weight. *Id.* § 404.1527(c)(2). If controlling weight is not given to a treating source's opinion, the Commissioner considers six factors in deciding the weight given to each medical opinion: (1) whether the source examined the claimant or not; (2) whether the source treated the claimant; (3) the medical signs and laboratory findings that support the given opinion; (4) the consistency of the opinion with the record as a whole; (5) whether the opinion is made by a specialist or non-specialist; and (6) any other factor which "tend[s] to support or contradict the opinion." *See id.* § 404.1527(c)(1)-(6).

While an ALJ should afford considerable weight to opinions and diagnoses of treating physicians when determining disability, sole responsibility for this determination rests with the ALJ. *Newton*, 209 F.3d at 455. If evidence supports a contrary conclusion, an opinion of any physician may be rejected. *Id.* A treating physician's opinion may also be given little or no weight when good cause exists, such as "where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 455-56. Nevertheless, "absent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in [then] 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. A detailed analysis is unnecessary, however, when "there is competing first-hand medical evidence and the ALJ finds as a factual matter that one doctor's opinion is more well-founded than another," or when the

ALJ has weighed "the treating physician's opinion on disability against the medical opinion of other physicians who have treated or examined the claimant and have specific medical bases for a contrary opinion." *Id.* at 458.

Here, Dr. Olusanya provided a treating source statement opining that Plaintiff suffered from focal seizures, type 2 diabetes, bipolar disorder, and a brain tumor, that her symptoms included pain, dizziness, blurred vision, fatigue, headaches, anger outbursts, and being withdrawn, and that these impairments would last at least twelve months. (doc. 11-1 at 973.) He determined that Plaintiff would need unscheduled breaks, that she could only sit or stand for 5 minutes at a time and for no more than 2 hours total, and that she could not twist or lift and/or carry even less than 10 pounds. (*Id.* at 974-75.) Dr. Olusanya also opined that Plaintiff would be unable to perform low stress work, and that her impairments or treatment would likely cause her to be absent from work more than four times per month. (*Id.* at 976.) He concluded that Plaintiff's pain would be severe enough to interfere with adequate performance of daily activities or work. (*Id.* at 977-78.)

As part of the RFC assessment, the ALJ expressly considered Dr. Olusanya's treating source statement, but ultimately gave no weight to his opinions. (doc. 11-1 at 29.) The ALJ acknowledged that Dr. Olusanya had a long treating relationship with Plaintiff, but determined that his opinion was "not supported by, and [was] wholly inconsistent with, his own progress notes, which record[ed] 'mild' findings in examinations and [were] generally unremarkable in nature." (*Id.*) She also noted that his assessment was based on Plaintiff's recent seizure disorder diagnosis, but that Plaintiff's treating neurologist did not limit or restrict her from working because of seizures. (*Id.*)

Although the ALJ did not make a specific finding as to each of the factors in 20 C.F.R. § 404.1527(c)(1), she specifically stated that she considered opinion evidence in accordance with the

requirements of 20 C.F.R. §§ 404.1527 and 416.927. (*See id.* at 20-21.) Her decision reflects consideration of the factors: she found that Dr. Olusanya had been Plaintiff's treating physician since January 2016, that the evidence cited in support of his assessment did not support debilitating limitations, that it was also inconsistent with the evidence from his treatment notes, and that his non-specialist assessment of Plaintiff's seizure disorder was not consistent with the findings of her treating neurologists. (*Id.* at 25-26, 29.) The regulations require only that the Commissioner "apply the factors and articulate good cause for the weight assigned to the treating source opinion." *See* 20 C.F.R. § 404.1527(c)(2); *Brewer v. Colvin*, No. 3:11-CV-3188-N, 2013 WL 1949842, at *6 (N.D. Tex. Apr. 9, 2013), *adopted by*, 2013 WL 1949858 (N.D. Tex. May 13, 2013); *Johnson v. Astrue*, No. 3:08-CV-1488-BD, 2010 WL 26469, at *4 (N.D. Tex. Jan. 4, 2010). "The ALJ need not recite each factor as a litany in every case." *Brewer*, 2013 WL 1949842, at *6 (citing *Johnson*, 2010 WL 26469, at *4).

The ALJ's reasons for assigning no weight to Dr. Olusanya's treating source statement, combined with her review and analysis of the objective record, satisfy her duty under the regulations and constitute "good cause" for affording no weight to Dr. Olusanya's opinions. *See Brewer*, 2013 WL 1949842, at *6 (finding the ALJ's explanation as to why he did not give controlling weight to a treating physician's opinion constituted "good cause" even though he did not make a specific finding as to each of the factors set forth in 20 C.F.R. § 1527 (c)(2)); *Johnson*, 2010 WL 26469, at *4 (same); *Hawkins v. Astrue*, No. 3:09-CV-2094-BD, 2011 WL 1107205, at *6 (N.D. Tex. March 25, 2011) (same); *Gomez v. Barnhart*, No. SA-03-CA-1285-XR, 2004 WL 2512801, at *2 (W.D. Tex. Nov. 5, 2004) (finding the ALJ complies with regulations if the resulting decision reflects that consideration was given to medical consultant's opinion).

25

C.    **Existence of Other Work**

Plaintiff argues that the ALJ failed to establish the existence of other work she could perform

given her impairments. (doc. 14 at 14.)

To be considered disabled, a claimant must have a severe impairment that makes her unable

to perform her previous work or any other substantial gainful activity existing in the national

economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. § 404.1505(a). "Work exists in the national economy

when there is a significant number of jobs (in one or more occupations) having requirements [that

a claimant is] able to meet with [her] physical or mental abilities and vocational qualifications." 20

C.F.R. § 404.1566(b). It is the Commissioner's burden at step five to show that a claimant is

capable of performing other gainful employment in the national economy. *See* 20 C.F.R. §

404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. Once the Commissioner finds that jobs in the national

economy are available to a claimant, the burden of proof shifts back to the claimant to rebut this

finding. *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing *Fraga v. Bowen*, 810 F.2d

1296, 1302 (5th Cir. 1987)).

The Commissioner may consult several different sources of evidence, including VEs and the

DOT,[8] to determine when presumptively-disabled claimants can perform alternative and available

work. *See Veal v. Soc. Sec. Admin.*, 618 F. Supp. 2d 600, 608 (E.D. Tex. 2009). VEs assess whether

jobs exist for a person with the claimant's precise abilities and help to determine complex issues,

such as whether a claimant's work skills can be used in other work, and the specific occupations in

---

[8] The DOT and its supplement, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (SCO), comprise a comprehensive listing of job titles in the United States, along with detailed descriptions of requirements for each job, including assessments of exertional levels and reasoning abilities necessary for satisfactory performance of those jobs. The Commissioner recognizes the DOT/SCO publications as authoritative, and routinely relies on them "for information about the requirements of work in the national economy." *See* SSR 00–4p, 2000 WL 1898704, at *2.

which they can be used. *See* 20 C.F.R. §§ 404.1566(e), 416.966(e).  The ALJ may further rely on the testimony of a VE in response to a hypothetical question[9] or other similar evidence. *Newton*, 209 F.3d at 458; *Bowling*, 36 F.3d at 435.  Social Security Ruling 00–4p[10] requires that prior to relying upon evidence from a VE to support a determination of disability, the ALJ must identify and obtain a reasonable explanation for any apparent conflicts between occupational evidence provided by a VE and information in the DOT. *See* SSR 00–4p, 2000 WL 1898704, at *1-2 (S.S.A. 2000).  As part of her duty to fully develop the record, the ALJ has an "affirmative responsibility" to inquire of the VE on the record whether or not there is such an inconsistency. *Id.* at 4; *see Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016) (citations omitted).

A direct conflict may arise when the VE's testimony regarding the exertional or skill level of a particular job is facially different than that indicated in the DOT, or when the VE's testimony creates a conflict between the ALJ's RFC determination and the description of the jobs in the DOT. *See Carey*, 230 F.3d at 145.  Conversely, implied conflicts and exceptions occur under various unique circumstances when VEs are called to testify as to an individual claimant's capabilities. *See Id.* at 146-47.  Because the DOT cannot satisfactorily address every such situation, claimants are not

---

[9]"The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).  A hypothetical question posed by an ALJ to a VE must reasonably incorporate all the claimant's disabilities recognized by the ALJ and the claimant must be afforded a fair opportunity to correct any deficiencies in the hypothetical question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

[10]Because conflict between VE testimony and the DOT occurred with some frequency, the Commissioner issued SSR 00–4p to ensure that ALJs would expose and reconcile such conflict before relying on VE testimony. *See* SSR 00–4p, 2000 WL 1898704 (S.S.A. 2000).  SSRs represent "statements of policy and interpretations" adopted by the Social Security Administration that are "binding on all components" of the Administration. *See* 20 C.F.R. § 402.35(b)(1).  While binding on the Administration, these interpretive rulings are not binding on the courts, so courts need not give them the force and effect of law. *Batterton v. Francis*, 432 U.S. 416, 425 n.9 (1977) (noting the varying degrees of deference the rulings may be afforded); *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001) (per curiam).  However, courts may "rel[y] upon the rulings in evaluating ALJs' decisions." *Myers*, 238 F.3d at 620.

permitted to scan the record for implied or unexplained conflicts and then present the conflict as reversible error. *See id.* Unless a direct and obvious conflict exists between the VE's testimony and the DOT, the ALJ met her step five burden. *See* SSR 00–4p, 2000 WL 1898704 at *4; *Carey*, 230 F.3d at 146 (when a "direct and obvious conflict" exists between the VE's testimony and the DOT, the ALJ must resolve that conflict by determining whether the VE's explanation is reasonable and thus more reliable than the DOT ); *Nichols v. Comm'r of Soc. Sec. Admin.*, No. 10-CV-0651, 2011 WL 2669056 at *6 (N.D. Tex. 2011) (When indirect conflict did not undergo adversarial development at the administrative hearing, the VE "testimony may be relied upon without resolving the conflict as long as the record reflects an adequate basis for doing so" (citing *Carey*, 230 F.2d 145-46)), *adopted by* 2011 WL 2669099 (N.D. Tex. July 6, 2011).

As discussed, the ALJ found in her RFC determination that Plaintiff had the ability to perform light work involving simple tasks and that only required her "to make simple work-related decisions." (doc. 11-1 at 22.)  At the hearing, the ALJ described a hypothetical individual of Plaintiff's age, education, and past work experience with the same RFC. (*Id.* at 81-82.)  The VE recognized that based on the hypothetical posed by the ALJ, only unskilled jobs would qualify. (*Id.* at 82.)  The VE identified cleaner or housekeeper, inspector and hand packager, and bakery worker as acceptable jobs given the ALJ's RFC, and noted that all three jobs had a Specific Vocational Preparation (SVP) rating of 2. (*Id.*)  The VE acknowledged that her testimony was consistent with the DOT, and it was not inconsistent with the Occupational Outlook Handbook (OOH). (*Id.* at 86.) The ALJ relied exclusively on the VE's testimony to determine that an individual with Plaintiff's RFC could perform other work as a cleaner, an inspector, hand packager, and a bakery worker. (*Id.* at 31.)

The ALJ complied with her duty under SSR 00–4p by asking the VE, on the record, whether her testimony conformed to the DOT. (*Id.* at 86.)  The VE responded in the affirmative, and Plaintiff's counsel failed to present any conflicts through cross-examination. (*Id.*)  Nothing at the hearing appears to have triggered any reason for the ALJ to elicit a "reasonable explanation" for any possible conflicts. *See Johnson v. Comm'r of Soc. Sec. Admin.*, No. 3:11-CV-3126-L, 2013 WL 632104, at *13 (N.D. Tex. Feb.4, 2013) (citing *Gaspard v. Soc. Sec. Admin., Comm'r*, 609 F. Supp.2d 607, 613-14 (E.D. Tex. 2009)), *adopted by* 2013 WL 628561 (N.D. Tex. Feb. 20, 2013).

Plaintiff argues and submits evidence showing that the jobs of inspector, hand packager and bakery worker are inconsistent with her RFC for unskilled work. (doc. 14 at 11-12.)  Even though the DOT identifies those jobs as unskilled, Plaintiff claims the DOT is outdated and that the ALJ should have relied on the OOH.[11] (*Id.* at 12-13.)  Plaintiff contends that under the OOH, the jobs of bakery worker and inspector, hand packager required "moderate-term on-the-job training," which indicates that they are beyond the unskilled level. (*Id.* at 11-12.)

"Whether the DOT is outdated is not a determination this Court can make." *Walker v. Berryhill*, No. 7:16-CV-00150-O-BP, 2017 WL 6883894, at *5 (N.D. Tex. Dec. 19, 2017), *adopted by* 2018 WL 339307 (N.D. Tex. Jan. 9, 2018).  Social Security regulations explicitly allow the ALJ to use the DOT, and it is widely utilized and referenced by courts considering Social Security cases in all circuits. *See* 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see also Donahue v. Barnhart*, 279 F.3d 441, 445 (7th Cir. 2002) (collecting the positions of the circuit courts on the amount of authority accorded to the DOT against contrary VE testimony); *Hernandez v. Astrue*, No.

---

[11]The Occupational Outlook Handbook is "a publication from the Department of Labor's Bureau of Labor Statistics," and it is available online at https://www.bls.gov/ooh/. *See Huizar v. Astrue*, 642 F. Supp. 2d 614, 640 (W.D. Tex. 2009).

A-06-CA-416 LY, 2007 WL 1746896, at *3 (W.D. Tex. June 15, 2007) (referring to the DOT as the "standard reference guide"), *aff'd by* 278 F. App'x 333 (5th Cir. 2008). Additionally, the ALJ's obligation to resolve apparent conflicts between the VE testimony and the DOT, does not additionally require resolution of a "possible conflict" with the OOH. *See* SSR 00-4p, 2000 WL 1898704, *2; *see Graves*, 837 F.3d at 593 (noting that there is no violation of SSR 00-4p if the plaintiff fails to show the VE's "testimony was actually inconsistent with the DOT"). The ALJ expressly sought evidence at the hearing showing that the VE's testimony was consistent with the DOT, and Plaintiff has failed to show an apparent conflict between the two.

Even assuming the existence of a conflict between the DOT and the VE's testimony, such a conflict would not be direct or obvious, and would instead be an implied or indirect conflict. *See Ceballos v. Colvin*, No. EP-13-CV-381-ATB, 2015 WL 474367, at *5 (W.D. Tex. Feb. 3, 2015) (determining that plaintiff's "argument relate[d] to an implied conflict between the VE's testimony and the DOT" because nothing in the DOT's job descriptions for the jobs identified by the VE "indicate[d] that six hours of standing and/or walking [were] required to perform the job[s]."); *Zapata v. Colvin*, No. 4:13-CV-340-Y, 2014 WL 4354243, at *11 (N.D. Tex. Sept. 2, 2014) (noting the difference between direct and implied conflicts with a VE's testimony). Plaintiff did not identify any conflict at the administrative hearing, and as noted, "[t]he Fifth Circuit has held that claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present the conflict as reversible error when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing." *Zapata*, 2014 WL 4354243, at *11 (citing *Carey*, 230 F.3d at 142); *see also Ruffin v. Colvin*, No. 3:16cv18-DPJ-FKB, 2017 WL 536549, at *6 (S.D. Miss.

Feb. 8, 2017) (finding that an "unexplained" conflict did not require remand because the plaintiff

"failed to raise it before the hearing officer"). Remand is not warranted on this issue.[12]

### D.    Plaintiff's Onset Date

Plaintiff argues that remand is required because the ALJ failed to provide any reason for

rejecting her amended date of alleged onset of disability. (doc. 14 at 4.)

#### 1.    Amended Alleged Onset Date

"The onset date of disability is the first day [a claimant] is disabled as defined in the Act and

the regulations." SSR 83–20, 1983 WL 31249, at *1 (S.S.A. 1983). "SSR 83–20 prescribes the

policy and procedure" for determining the onset date. *Spellman v. Shalala*, 1 F.3d 357, 361 (5th Cir.

1993). If the impairment is of traumatic origin, the onset date "is the day of the injury." SSR 83–20,

1983 WL 31249, at *2. If it is of non-traumatic origin, i.e., a "progressive" impairment, three factors

must be considered: "the individual's allegations, the work history, and the medical evidence."

*Spellman*, 1 F.3d at 361. Although the starting point is the "claimant's allegation as to when the

disability began, ... and the date that his disability caused him to stop work[ing] is often very

---

[12]Plaintiff also argues that the ALJ's RFC of standing and walking for 6 hours out of 8 hours is insufficient to allow for performance of the job of cleaner, housekeeping because "there are no housekeeping cleaner duties which are performed in a seated position." (doc. 14 at 12.) The job description for cleaner in the DOT does not address the requirements of the job in terms of body positioning or what tasks and duties can only be performed while standing or walking. *See* Dictionary of Occupational Titles,§ 323.687–014, 1991 WL 672783 (4th ed. 1991). Nevertheless, even if the VE's testimony was not consistent with the DOT on the cleaner, housekeeping occupation, remand is not required because the VE's testimony regarding the number of inspector, hand packager and bakery worker jobs available are sufficient to constitute substantial evidence supporting the ALJ's decision. *See Gaspard*, 609 F. Supp. 2d at 617 ("The Commissioner's burden at Step 5 of the sequential evaluation process ... is satisfied by showing the existence of only *one* job with a significant number of available positions that the claimant can perform.") (emphasis in original) (citing *Evans v. Chater*, 55 F.3d 530, 532-33 (10th Cir. 1995)). As discussed, the VE testified that there were 25,000 jobs nationally for inspector, hand packager, as well as 35,000 jobs nationally for bakery worker. (*See* doc. 11-1 at 116-18.) The ALJ's finding that "there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform" is supported by substantial evidence. *See* 20 C.F.R. § 416.966(a) ("[W]ork exists in the national economy when it exists in significant numbers either in the region where you live or in several other regions of the country."); *see also, e.g.*, *Gaspard*, 609 F. Supp. 2d at 619 (stating that various appellate courts have found 500, 650-900, and 1,400 jobs in a state to be sufficient to constitute a significant number of jobs); *Mercer v. Halter*, No. 4:00-CV-1257-BE, 2001 WL 257842, at *6 (N.D. Tex. Mar.7, 2001) (concluding that 500 jobs in Texas and 5,000 jobs in the national economy constituted a significant number of jobs).

significant," "the medical evidence is the primary element." *Id.* (citing SSR 83–20, 1983 WL 31249, at *2).

The claimant's alleged onset date is adopted "if it is consistent with all the evidence available." SSR 83–20, 1983 WL 31249, at *3; *accord Spellman*, 1 F.3d at 361. If not, "additional development may be needed to reconcile the discrepancy." SSR 83–20, 1983 WL 31249, at *3. An ALJ may reject a claimant's alleged onset date "if [his] reasons are articulated and the reasons given are supported by substantial evidence." *Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000) (citing *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990) and *Spellman*, 1 F.3d at 361). Ultimately, the ALJ should set the onset date as "the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the [claimant] from [working]" and should give "[c]onvincing rationale ... for the date selected." SSR 83–20, 1983 WL 31249, at *3.

Here, Plaintiff initially alleged disability beginning June 1, 2016, in her applications for DIB and SSI. (doc. 11-1 at 259, 261.) At the hearing, she moved to amend her onset date to some day between November 2 and November 30, 2015. (*Id.* at 41-42.) The ALJ did not acknowledge the amended onset date in her decision, and she concluded that Plaintiff had not been under a disability from June 1, 2016, through May 31, 2018. (*Id.* at 32.) Accordingly, the ALJ erred when she implicitly rejected Plaintiff's amended onset date without explanation. *See Loza*, 219 F.3d at 394; *Spellman*, 1 F.3d at 361.

### 2.    Harmless Error

The Fifth Circuit has held that "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party are affected." *Mays*, 837 F.2d at 1363-64. "[P]rocedural improprieties ... will therefore constitute a basis

for remand only if such improprieties would cast into doubt the existence of substantial evidence to support the ALJ's decision." *Alexander v. Astrue*, 412 F. App'x 719, 722 (5th Cir. 2011); *see Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988) ("[E]rrors are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision."). The ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. To establish prejudice that warrants remand, Plaintiff must show that the ALJ's failure to discuss the reasons for rejecting her amended onset date casts doubt that substantial evidence supports her disability determination. *See id.*; *Morris*, 864 F.2d at 335.

Here, the ALJ's decision referenced Plaintiff's medical records dated between October 2015 and October 2017. (*See* doc. 11-1 at 15-32.) Even though the ALJ did not explicitly acknowledge the amended onset date of November 2015 in her decision, she referenced and considered medical evidence from the period at issue. *See Jackson v. Saul*, No. 4:19-CV-00289-A, 2019 WL 6970987, at *9 (N.D. Tex. Nov. 20, 2019), *adopted by* 2019 WL 6915689 (N.D. Tex. Dec. 19, 2019) (finding the ALJ's failure to amend the onset date was harmless error where "the evidence he referenced from the record was dated almost entirely after the amended onset date"). Because substantial evidence supports the ALJ's conclusion that Plaintiff was not disabled throughout the alleged period at issue, her substantial rights were not affected. *See Alexander*, 412 F. App'x at 722; *see, e.g., Wilson v. Colvin*, 2017 WL 121056, at *9 (S.D. Tex., 2017) (explaining the ALJ's lack of explanation for rejecting the alleged onset date was not prejudicial to plaintiff where the medical records did not support any finding of disability as of that date); *Wallace v. Colvin*, No. 2:11-0100, 2014 WL 2117500, at *10 (M.D. Tenn. May 21, 2014) ("[E]ven though the ALJ erred in misidentifying the plaintiff's alleged disability onset date, the error was harmless because the ALJ's

decision would have likely been the same."). Accordingly, the ALJ's error in failing to acknowledge the amended onset date was harmless and does not warrant remand.

## IV. RECOMMENDATION

The Commissioner's decision should be **AFFIRMED**.

**SO RECOMMENDED**, on this 10th day of September, 2020.

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_Irma Carrillo Ramirez_
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE